Thank you, your honors. Good morning, your honors. May it please the court. My name is Cheryl Lianza. I'm here on behalf of petitioners Boston et al. I'd like to reserve six minutes minutes for rebuttal. I realize I have to manage my own time this morning in order to organize our discussion. I am going to focus my remarks on the cabinet rule and the express evidence rule. And Mr. May, Mr. Robert May is going to focus on the concealment rule and the shot clock. We are here today because the federal agency is operating outside of what is required of it, outside of the bounds of the law. The statute at issue in this case is a very narrow exception to a general regime. The general regime covers new placements of wireless facilities, substantial changes to wireless facilities, and local governments who want these services and their constituents who want these services have worked with wireless companies to place these facilities throughout the country. There are hundreds of thousands of them around the country. There are hundreds in San Francisco alone. You probably go by them every day. The statute in this case, 6409, is a narrow exception to that general regime. And it's very severe. Local governments may not deny and shall approve, but only in substantial changes. Once something qualifies under 6409, it is automatically going to be approved without any other recourse. I have a question about the express evidence rule, which is, what, what, yeah, sure. What, what practical effect do you think that the express evidence rule has? What are the modifications that it would permit that you think otherwise could be prohibited? So, thanks, Your Honor. The FCC's express evidence rule applies to two pieces. The concealment rule in section B75 and B76. So, for concealment, it says the local government must not only have a validly adopted permit with all of the criteria, a validly adopted zoning ordinance, but it also must explain, hey, we decided that it should be this much circumference and this color because it needed to look like a telephone pole, because it needed to look like something else. That is not a typical way that local governments grant permits. And, in fact, it's part of the problem that we see here and that the FCC is acting outside of its expertise with regard to the express evidence rule. With respect to B6, Your Honor, B6 requires the FCC to show that the condition is ongoing. Once again, that is not your typical law, permitting law or zoning law. The FCC misunderstands that law, which is one of the big reasons that we think that this does not deserve deference under Kaiser. It is completely clear that even under all the FCC's understanding of substantial and insubstantial, there will be substantial changes mandated because of this evidentiary ruling, because the local government is not going to be able to show this evidence, because the local government could not foresee when it was adopting a permit that at some time in the future, a law would be passed and the FCC would adopt rules that would require them to say something that they had no idea was coming. So when we look at an agency that's acting with respect to the reinterpretation of its codified rules, we're in a serious situation because the agency is acting as the legislature and the judiciary in one, right? Which is why the Supreme Court is so careful and so insistent that courts give this careful and searching review when an agency is reinterpreting its own rules. In the FCC, we look at Kaiser and Kaiser says, we always, both Kaiser and Landgraf are relevant with regard to the express evidence rule and both of them rightfully focus on what does the statute require. So as I said, we're going to get substantial changes mandated through the express lane process. In addition, we are seeing the FCC, as Kaiser suggested, operate outside of its expertise. How do we know the FCC doesn't have expertise? How do we know that Congress didn't intend for them to rewrite zoning and permitting laws around the country? First, the FCC says it didn't have expertise. It's 2014 order and paragraphs 234 and 235. So in fact, it's the basis for the ruling, the rule in C5 of the FCC's regulations, because it says, you know what, go to the courts, go to the judges, we don't really understand. We don't want to be a national zoning board. The FCC didn't evidence any expertise when it wrote its order. If you look at the paragraphs 38, 41 through 43, there's no evidence of them analyzing the law, understanding what permitting rules typically require, discussing what they typically look like. It doesn't deserve really even skid more deference. We also know that this is an example of an agency playing outside of its lane, because the Supreme Court in Kaiser cited almost an exactly identical case. The Federal Energy Regulatory Commission was playing outside the lane and making determinations as to property law. And the Supreme Court said, yeah, this is exactly what we're talking about. And we say, make sure that the agency is doing what Congress said it should do, not more. Similarly, we are looking at in Kaiser and Landgraf have similar concerns also about retroactivity. This rule is impermissibly retroactive. Kaiser is also concerned with a similar idea, which is unfair. I guess I don't understand why the rule is retroactive. I mean, isn't it just saying that if municipalities want to prevent modifications on the basis of existing requirements, that they have to show that those requirements in fact existed? Why is that retroactive? Well, Your Honor, if we were going to rely on existing zoning and property law for local governments to show that these permit requirements existed, that's fine. We have no concern with them having to say, look, here's the permit. It says it has to be this color. It says it has to be behind this tree or behind this parapet. The concern is zoning boards typically what they do are, I'm sorry, are permitting boards, right? They get plans from the proponent and they detail lots of elements. And then usually they just say approved. And so it doesn't say we approved this color, this size, this aspect, because we want it to look like a tree, because we want it to look like. And so it's that element of extra explanation that we're concerned about. We would appreciate and agree that the order should be, it should be clear that existing zoning and permitting law is the standard, but not a new and additional evidentiary standard. And so I think that largely sets up what I wanted to say about the express evidence rule, but I'm happy to take other questions and move on to cabinets. Why don't you move on to cabinets? Okay, great. So with regard to cabinets, which is in B7-3 of the FCC's substantial definitions, in substantial definitions, the FCC determined that there is no cumulative limit at all for cabinets. That means these cabinets are going to get approved over and over again. Okay, so, counsel, when we look at what the reg says, why don't you go to the issue of it? Sure, I'd be pleased to do that, Your Honor. And when I'm reading it, it certainly seems to me, as the government argued, that it is referring to the modification, right? Well, it is, Your Honor, but... So if it refers to the modification, then why wouldn't we read it, the modification involves installation of more than the standard number, but not to exceed four? Because, Your Honor, the same exact formulation is used in B7-1, the height rule. Four towers, it increases. Each of these rules has the same type of analysis, but in the height rule, we have a cumulative limit. It's very clear. It's an A. So the word it cannot be doing all of that work. We also know that this is the case, this is a problem, because when the FCC originally adopted the height rule, it acknowledged that repeated changes over time could result in a substantial change outside the bounds of the statute, but it doesn't make the same acknowledgement for cabinets. And as we said, the statute requires these changes to be insubstantial. Every time you get a new service, every time a new provider wants to put a new, they can put new, they can co-locate. So if AT&T is there, then Verizon can come in, too, or T-Mobile. So we have, over the course of time, no limit on these cabinets. Okay, well, let's say you had a situation where the new technology involved, because that's, I'm sorry, the new equipment cabinets for the technology involved. So if, for example, in a circumstance that nobody's arguing, if the new technology limits it to two and somebody wants to put in four, they're out, right? Yes, it is. So if you have that, if the new technology says seven, says you get seven here, and I don't know if you're familiar with the term parceling in the money laundering context, but that's all right. I'm going to ask your friends this. But if somebody decides to parcel and say, even though the new technology is seven, we're going to, or the new technology is nine, we're going to go for four now and five, or we're going to go for four now and four later because we couldn't get eight now. Wouldn't that be a problem even under the government's explanation that if you're parceling with the technology involved, you can't do it? Well, the FCC's order doesn't say that, Your Honor. Well, I'll ask your friend that when I ask them about parceling. Absolutely, and I did also want to draw your honors to the language in three, which says, but not to exceed four cabinets. I wanted to be clear that this first sentence in three, before the semicolon, right, that's the general rule. All eligible, any eligible support structure, that's everything. And then after that, it says only for towers and the public rights way and base stations or essentially buildings, there's an additional limit, right? So you have a general rule at the top, and it says not more than the standard, but not more than four. And, Your Honors, local government are here. We're looking at the statute, which says insubstantial changes only, and we cannot reconcile a situation where there's an unlimited number of changes. And, in fact, when the FCC was faced with this on brief, it didn't point to anything to his order explaining why this rule is consistent with the statute. It could only point to elements in the comments, and the comments referred to situations where there's a physical maximum before the pole is going to fall over. The physical maximum is not insubstantial. Unlimited is not insubstantial. So right out of the gate, the FCC is not consistent with the statute. And if you could read the rule consistent with the statute, you should. But not to exceed four allows you to read that rule as a cumulative limit and thus keep it within the boundaries of the statute. That's how local government was trying to do it, and now the FCC has made clear they have no limits whatsoever. The last thing I wanted to say is that it's also arbitrary and capricious, so it should be remanded. Regardless, because of the distinction between the height rule and the cabinet rule that I expressed earlier, if one rule has to limit cumulative changes in order to keep within the bounds of the statute, why doesn't the other? So the FCC needs a chance to go back and redo this. Also, the other big problem with the cabinet rule is the small equipment. The FCC redefined cabinets to exclude the small equipment. If your honors want to see small equipment, the two small pictures on page 40 is that. And now there's no limit whatsoever. You can have as many pieces of small equipment as you want. Unlimited does not mean insubstantial. So we request that your honors reverse the FCC, vacate the ruling, and I'd like to reserve the balance of my time unless you have any further questions. Okay. Thank you. Good morning, your honors, and may it please the court. My name is Robert May, counsel for the Petitioners League of California Cities. I'll be focusing on concealment elements under subsections B-7-5 and B-7-6 and shot clock issues under subsection C-3. The main problem with the reinterpretations under the declaratory ruling is that the codified rules no longer mean what they say. And under Kaiser, no deference can be given to an interpretation that changes the fundamental meaning of the rule. Even if these interpretations were somehow within the scope of the agency's interpretive authority, they should be nevertheless struck down as arbitrary and capricious. So I'll start with concealment elements. Under section B-7-5, any change that would defeat the existing concealment elements of an eligible facility, I'm sorry, an eligible support structure, is substantial and therefore excluded from the amendment of 6409. Concealment itself is not defined in the regulations, but it has an obvious plain meaning. It's not defined to hide something. And the FCC and judicial precedents have recognized that concealment can take many forms, as simple as matching paint or as elaborate as a fake tree. So, counsel, let's assume for the sake of argument that we found some ambiguity there. What should we, and I'll be asking your friend this, what significance should we afford to the FCC's brief before the Fourth Circuit where they specifically told the Fourth Circuit that where an existing tower is concealed by a tree line, then getting rid of that would constitute a substantial change? Is that just something that's irrelevant? Or what weight should we give it if we decide that there is some ambiguity here? Well, just like the rules need to mean what they say, I think the government needs to mean what they say when they take a position and ask the courts to rely on it in upholding the validity of those rules itself. I think the example also calls into question what's going on in the reinterpretation of B-7-6. This provision creates a general rule that says any violation of a prior condition of approval is a substantial change unless the noncompliance for the modification arises only from increases in height with equipment cabinets or footprint that's otherwise allowed by the FCC's rules. So, to give you an example, if you have a tree that is hidden behind other trees and that's conditioned as part of the approval itself, the increase in height wouldn't just violate the concealment elements under Section B-7-5. It would be a violation of the condition under B-7-6. Because in your view, B-7-6 only has this exception for one little eye through four little eyes, not five little eyes. Right. The rule lays out those exceptions for height with cabinets and things like that, but it's only when the noncompliance is only arising from those changes. And in this case, it would be arising from both increase in height and a violation of the aesthetic condition that's meant to hide the facility. So, when the FCC is reinterpreting these statutes, it's not just violating the plain language. It's violating and contradicting the way in which they've represented these rules operating in the past. So, Counsel, I can ask this of your colleague, but if, hypothetically, we were to agree with you that concealment elements means what you say it means, how much does that affect our need to decide the express evidence question? I think it still presents a problem for local governments because the FCC's interpretation says that it's concealment elements, if it's on stealth, and if you disagree with that, then we still have to contend with the fact that it has to be a concealment element of the original approval that was supported by express evidence in the record. So, we would still like to go back to the way that this was originally implemented and say that concealment elements mean things that hide. So, you think that even if we were to hypothetically say, we're agreeing with what the FCC told the Fourth Circuit, that we would still need to say, and that doesn't have to have been expressly relied upon by the initial citing approval? Correct, because as my colleague was indicating, this express evidence rule is narrowing the field of eligible facilities that have concealment that could be protected. Local governments don't normally go through the process of labeling every little thing that says, this is for concealment. And so, if they don't have that kind of express evidence somewhere in the record, it could be a concealment element that's just not protected because there was no supporting evidence in the record. That's not... So, I want to make sure I get to the rest of these points. The agency interpretation, as this court said, in Hemp Industries versus DEA, is tantamount to a legislative rule change where the interpretation includes what the rule excludes or vice versa. And that's exactly what's happening here. The declaratory ruling excludes protections for existing concealment that the codified rules include. And this doesn't mean that the FCC or any other agency could never use an interpretive ruling to clarify or elaborate on its legislative rules. The FCC's response brief includes some examples where this court's upheld. It's like Gunderson v. Hood. In that case, the agency interpreted ammunition, which contains black powder, to be included in the definition of explosives that parolees just weren't allowed to have. This makes sense because the gunpowder explodes. But the declaratory ruling is doing something different. Rather than saying, here's a specific example and this is how it fits into our general category, the declaratory ruling is trying to get rid of the general category of concealment elements and replace it with just stealth. And so you're also going to be talking about the shot clock and the separation issue? Only the shot clock. Okay, only the shot clock. I have a question about the concealment elements issue before you move on. Is there any point in the 2014 order that concealment elements is defined without a reference to stealth facilities? I didn't see any place in there. There's a footnote that I can find for you, if I can channel my mind. When they're discussing what substantial changes are not objective that they would include. So Congress intended to protect concealment just the same way Congress intended to protect health and safety. So anything that defeated concealment would be on par as a substantial change with anything that violated health and safety rules. And there's also the discussion, right, on paragraph 200 of the M-dashes? Yes, but I see my time is getting low and I still want to get to the shot clock. So if you'd like to go through the M-dashes, we certainly could. No, but if you could find that, locate that footnote for me before you get back up, that would be helpful. Thank you. So turning to the shot clock, if there are no further questions on concealment elements, subsection C-3 unmistakably requires a filed application to trigger the running of the shot clock. But the declaratory ruling allows the shot clock to start without a filed application in some fairly common circumstances. This is because the shot clock under the declaratory ruling starts when the applicant takes the first procedural step towards an approval or decision and then files some written documentation with the local government that explains why it meets the criteria for a nonsubstantial change as laid out in the coded rules. But using an example from the declaratory ruling itself, if a local government requires the providers to meet with them before they file the application, that meeting itself is the first procedural step. And if the provider has already submitted the written documentation, the shot clock starts at that meeting whether an actual application has been filed or not. So this fails the first step of Kaiser. This particular regulation means what it says. The shot clock starts when an application is filed. But the declaratory ruling is going outside of this by saying that providers are excused from what the rule requires. There's also a failure of rational connection between the facts in the record and the conclusions that were reached. The rule's interpretation is based on the mistaken assumption that there is nothing in the rules that already say when the shot clock starts. And because of that mistaken assumption, there's really no meaningful discussion at all about why C3 doesn't just say what it means or mean what it says, that the shot clock starts when an application is filed. There's also no discussion about why the FCC appears to have changed its position for the 2014 order where they said repeatedly the same thing that shows up in C3, that the shot clock starts when an application is filed. You're talking about their footnote 39? In the responsive brief? No, I'm sorry. Nevermind, go ahead. All right. There is argument in the FCC's responsive brief that the written documentation required by the rule is the application and submitting it to the local government is the filing, but this is just another way of reading C3 out of the statute altogether. This argument also does not appear to show up in the declaratory ruling itself, and so it starts to look like a post hoc rationalization. In closing, I'd like to point out that this case involves two things that affects everybody whether they see it or not. It's wireless facilities and the scope of agency authority over rulemaking. How the court decides this case will have a lasting impact on both. And the declaratory ruling includes changes, not clarifications, that materially and adversely affect local community aesthetic protections and protections over the ability to process applications in a sensible way. This court should invalidate these rules and remand back to the agency. Thank you. Good morning, your honors, and may it please the court. I'm Rachel Proctor-May for the FCC, and I'll be sharing seven minutes of my time with Mr. Turner representing industry intervenors. I think it might be helpful for purposes of clarity to start by just walking through how the framework works at a high level. So the 2014 rules define what it means to substantially change the physical dimensions of an existing structure for purposes of determining whether new modifications, whether local control over new modifications, are preempted. And it does so, as you know, with six criteria, the first four setting numeric thresholds, and the second two governing local conditions. And the difference between the second two is that those that count as concealment elements of the eligible support structure under five can be enforced to prevent changes that would not be substantial under the numeric criteria. And six can be enforced except to the extent which they would prevent those insubstantial changes. And so, as we know, the rules were challenged and they were upheld, and then interpretive issues arose. And some of the interpretations that were being offered would have the effect of taking most, if not all structures outside the reach of section 6409. So the commission issued a declaratory ruling under its authority to do so under rule 1.2 and section 554 of the APA to clarify the meaning of those rules as to discrete issues that it wanted to resolve expeditiously. And here we are. So I think a good place to start would be the height provision. And again, I think it would be helpful to just walk through how the height provision works. The height provision sets a baseline against which each modification is measured. So whether it's the first modification or the 10th modification, you get the threshold that's allowed. And the threshold that is at issue here is the threshold that is applicable to towers outside the public right-of-way. All right, so let me ask you a question. Let's hypothetically assume a 200-foot tower, 200-foot existing tower. So as I understand it, a 102-foot new antenna with 20 feet of separation is okay. If there were such a thing? Yes, I understand. Correct. So yes? Yes. But a two-foot tower with 21 feet of separation would be no good. A two-foot antenna with 21 feet of separation would be no good. Correct. So increasing by 23 feet in that instance, the total height of the tower, no good. But in my perhaps fanciful hypothetical, increasing by 122 feet would be okay because the separation's only 20 as opposed to 21. Correct. So how's that logical? Sure, I think it is a reasonable interpretation and a logical interpretation. Yeah, why don't you tell me why it's logical? I'll tell you why it's logical. It's logical because the commission was drawing on its understanding of typical antenna sizes. That's in paragraph 25. And there is no evidence either in the record or that the petitioners have brought that there are any wireless antenna that would ever be that tall. But why is separation, which is basically blank space, right? Why is separation more important than either the antenna height or the total height? Why is separation so relevant that it controls? Yeah, I don't know if I would necessarily consider it controlling. I think the way to think about this rule is in a statute that is encouraging co-location, it is not a substantial change to add an antenna. But as a practical matter, antennas need to be separated from other antennas in order to work. And so that is not a license to then stick your new antenna 100 feet in the air. You only get 20 feet of separation. So counsel, I have one other question on this, which perhaps idiosyncratically has confused me from the beginning on this provision. So the provision talks about 10% to start with, and then it has the provision at issue, right? And then it says, whichever is greater. So what, in your view, so I understand the more than 10% part. That's easy. If it's a tower is 200, then more than 10% is more than 20. And then there's this part two. In comparing whichever is greater, what are we comparing to part one? Because normally you compare apples to apples, numbers to numbers. So what are we comparing to in part two to part one? You're going to have an actual, this is going to be applied with regard to an actual application for a modification. So what we're comparing is the antenna that's being proposed, which everyone agrees will be 10 feet. And then there will be some amount of separation that can't exceed 20 feet from the highest point of the nearest existing antenna. And then you're measuring the height increase of the overall tower. But what are you comparing in my hypothetical to 20? Normally that would be a number, whichever is greater. And as I understand it, in your view, the height of the antenna doesn't matter. That as long as the separation is 20 or under, it's okay. No, Your Honor, because- The height of the new antenna doesn't matter. The height of the new antenna does matter. I mean, I think that we can say that the, for purposes of how the rule is phrased, it does not, it leaves the, what you're comparing the 10% to indeterminate. But this rule is always going to be applied with regard to a particular application. So you're looking at, with regard to your 200 foot tower, you've got the 10% or 20 feet. And then you're looking at the proposal that is before the local government. And so that proposal is going to be, let's say it's a two foot antenna and 20 feet of separation. That's going to be 22 feet. And so that controls. Or a two foot or a 20 foot antenna. Or a 20 foot antenna. And 20 feet of separation. And in that instance, you're comparing 20 to 20 plus 20. Correct. Or 100 plus 20. Correct. Yes. Okay. And I would just stress that there is nothing to suggest that there are any antennas that are that tall. The petitioners point to a standard range of antennas, which is four to eight feet tall, maybe 10. And then they give some extreme outliers that have to do with broadcast towers that are functionally an antenna that are hundreds of feet tall. But they don't give any examples of anyone who's ever tried to put a broadcast tower on top of a cell facility. From there, I'd like to move on to cabinets if I could. Again, let's start with the big picture. So what a co-location is, is putting multiple pieces of transmission equipment on a structure. And sometimes a provider will take those pieces of transmission equipment and put them in a piece of equipment whose purpose is holding other devices. It is a physical container for other devices. And that is what a cabinet is under the industry understanding. And I think it accords with our plain meaning, our plain English use of the word cabinet. Localities argue that this definition of cabinet should not be used, even though they don't disagree that this is a, they don't disagree that this is a correct understanding of what cabinet is, but they argue that the FCC should not adopt it because it excludes the small devices that are the transmission equipment that is. So cancel on the number of cabinets. Correct. So let's say you have, for the new equipment cabinets, for the technology involved. Let's say for the technology involved says you should have eight. Okay, and let's say somebody goes in and says, all right, here's, the new technology says eight, so here's our today application for four, granted. And tomorrow we put in a new application for the rest of the four, which is the same technology where it obviously wouldn't have been under this exception if it had all been put together. Does that work? Well, in the hypothetical that you gave, that would not work because I think that it is fair. The rule operates on a per modification basis. And so if you've got an application today and an application tomorrow that are both referring to work being done on the same facility, I think it would be fair to consider that the same modification. If it were under the same technology and doing the same function. If this were the standard number for the new technology involved, then yes. And it was, again, somebody's trying to game the system. So you're from, are you familiar with the term parceling? I'd rather have you tell me what you're thinking of. Well, I mean, it's like if you have a limit on a procurement amount that you can do without competitive bidding, you can't get around a competitive bidding requirement by parceling it into two parts. So the FCC's position is that you couldn't game the system in that way under this interpretation. I think under the hypothetical that you gave me where it's a modification, I mean, it's an application today, it's an application tomorrow, and it's clearly referring to the same modification, that would probably not work. I think there's other situations that one might think implicate that concern, but I don't think they would. So for example, let's say there is a addition of cabinets today, and then six months later, there's been a growth in service. And the same provider wants to add to their existing technology to meet that growth in service. That would be allowed. There's nothing in the cabinet rule that would prevent that, even if it's exceeding the standard number for one modification. Because that's a feature, not a bug. The rule is supposed to allow for co-locations, and that is what the provider would be doing, would be co-locating on an existing facility to meet new demand. You look, did I answer your question? Yes. Okay. So I'd just like to address two arguments that have been offered against our interpretation of the cabinet quantity provision. The rules do not allow unlimited growth in cabinets. There are six substantial change criteria, and it does not take a numeric limit, a cumulative limit on the number of cabinets to address growth in the physical dimensions of cabinets when you have other provisions that are addressing growth in the physical dimensions. And so, they're also, for the same reason, it's not a meaningless restriction. I think their argument that it's meaningless is that there are other provisions that set maximum dimensions, but it's not meaningless just because it doesn't have those maximum dimensions. And in fact, I'd flip the argument. The fact that there are other provisions that address maximum dimensions supports an interpretation that what 3 is doing, the first part of 3, is addressing something different. It's addressing the problems that might arise from unusually substantial individual deployments. Okay, if I could move on to concealment. So, the commission's interpretation of 5, concealment elements of the eligible support structure, gives meaning to that entire text. Elements of a structure that make a structure look like something other than a wireless facility are elements of the structure. Locality's reading, I would say, has two textual problems. First, on reply, petitioners argue that what 5 means is it should cover anything consciously intended to conceal. But conscious intent is nowhere in the text. So, that's the first textual issue. Well, I think part of their issue is concealment elements is a term of common meaning that people can understand. I'm not sure if that makes sense within the overall structure of the rule and within the language of concealment elements of the support structure. I don't know, it seems pretty straightforward to me. I would have, I mean, not obviously being a layperson, I would have interpreted it the way one of your colleagues or former colleagues did in arguing to the Fourth Circuit that where an existing tower is concealed by a tree line and its location below the tree line was a consideration, in its approval, an extension that would raise the height of the tower above the tree line would constitute a substantial change. I mean, that strikes me as an extremely straightforward exposition of a provision that looks pretty clear to me and that that's a common sense explanation of how it works. So one thing to keep in mind is that the brief was not addressing the line between five and six. That was just not an issue in the Fourth Circuit litigation. And so to the extent that the brief can be read, the illustrative example that was given can be read to suggest a different understanding of the line between five and six. You mean when it says this would constitute a substantial change? Yes, that part. So even if that represents a different understanding of the line between five and six, the commission has acknowledged that potential inconsistency and explained it. It is explained that in light of the subsequent experience with post hoc conditions and with using every aspect of a wireless facility as concealment, that it now draws the line between five and six where it draws the line. And that is in a place that makes clear what's going to fall under five and what's going to fall under six. Because if you- Even if hypothetically I accepted that explanation as potentially viable, why wouldn't the commission decide to do it in a legislative rule? What would have been the harm there? The commission was trying to resolve interpretive issues that had arose in an expeditious fashion. The petitions for declaratory ruling or petitions for declaratory ruling, they sought many changes including rule changes and the commission saw this as an interpretive issue. But isn't it normal that if people like the lawyers for the FCC could have reasonably interpreted a provision as meaning one thing and the commission decides, no, no, no, it actually means something very, very different than what our lawyers said it meant and that people have taken it to mean, wouldn't it make sense to follow the APA to either amend the rule or to have a legislative ruling instead of an interpretive one? What's the harm there? Well, a few things, Your Honor. The test for whether a rule is actually an amendment is whether it's inconsistent with the text. So even if there was a different interpretation before and now the new interpretation is different, it's still an interpretation. It is not an APA violation to reinterpret. Agencies are allowed to change their interpretation. And so with what is the harm, I think the agency wanted to quickly resolve these interpretive issues that were arising as explained in the petitions for declaratory ruling and in the record and as cited in the order, there were localities that were interpreting five in a way that made every aspect of a facility a concealment element. There was a locality that defined like by ordinance every aspect of a facility is a concealment element and that is allowing localities to condition their way out of section 6409, which cannot be what the rules were initially intended to mean. I'd say the other problem with going back to petitioner's interpretation is that it does not draw a clear line between five and six. There has to be a clear line between five and six because we have to know whether a condition can be enforced to prevent de minimis changes. And so if the line turns on the intent, because as petitioners argue, there can be placement conditions or height conditions and other kinds of conditions that could be either for aesthetics or for some other purpose of such a safety. So if the line between five and six is what is the purpose, what was the locality intending, then the enforceability of these local conditions turns on intent and that is not solving disputes, which was the point of the 2014 order. That may not solve disputes, but disputes could perhaps be solved in a different way by just saying concealment elements means what it says. And the tree line thing is a concealment element. One of these really minor things that they're using as an excuse isn't. So I think the problem with interpreting, the structural problem of interpreting concealment element to mean anything that conceals is then it becomes unclear what work six is doing. Because as we know, localities have interpreted every aspect of a facility to conceal. And so then that leaves six as being a very small, if meaningful at all category. And I know I've taken up a lot of your time, but you want to talk about the shot clock. Yes, so the language that the localities are relying on is from the provision governing tolling. I think if you read the entire subsection C, it is very clear that the shot clock as defined in C2, not the tolling provision of C3, but C2 is submitting the request for. Then why in the rest of that sentence is the word shall approve the application? I mean, the first word is submits a request, and then it says shall approve the application. And then three says the 60 day period shall begins to run when the application is filed. Exactly, so we don't, I think we've got really a straw man here. I don't think we disagree that there is a requirement to file an application. What we're disagreeing about is what the application is. We contend that the application is the request for streamlined treatment, and it is limited to what is in one. So what you're saying, what the FCC says, an application is a letter. I'd like to meet with you, and here's why we meet your requirements. And even though there's an application form, it's reasonable, they don't fill it in, but basically the 60 day period begins with the letter, we'd like to meet with you. If there is an application that the locality requires as a first step, then yes, that is required. Well, I thought it's that as long as we show why we meet the requirements, isn't it? No, I'm sorry, it is a two part requirement. The shot clock begins when the locality takes the first step in whatever local process exists that is verifiable and within the locality's control. And to the extent that's not already required by the first step, submitting the written documentation. So the locality could have submission of the application as the first procedural step. Exactly, and it can do things like set up a portal, set up a portal requiring you to submit it electronically, it can designate, here's how we want to receive them, we want it on blue paper, and they can set it up however they want. What they can't do is require an onerous series of meetings with various officials to delay the start of the shot clock. And if I could very briefly address the express evidence requirement. Why don't we put two minutes on your clock? Put two additional minutes on and take as much of that as you want. The express evidence requirement is not retroactive. The express evidence requirement is determining which concealment elements and conditions count for purposes of preemption. So that's not any more retroactive than any other preemption of laws or rules that were adopted in the past. And so for the same reason, it also doesn't implicate policy expertise in local zoning matters because the commission can reasonably determine that in fleshing out what substantial change to the physical dimensions means, it's going to protect some conditions, but it's going to limit those to conditions for which some evidence exists. Can you respond to the point that was made that when the locality's issue permits, they would not say this is approved because it looks like a tree? Well, so that's a concealment element. That's an argument about whether a concealment element exists and I'd just like to point to the language that says, there must be express evidence in the record to demonstrate a locality considered in its approval that a self-designed for telecommunications facility would look like something else. So in many cases, I think it would be clear that if there is a request for a approval of a facility that looks like a tree, that it would meet that language. If there are no further questions, I'll give you your 16 seconds back. Thank you. Thank you. Good morning, your honors. Excuse me. May it please the court, Joshua Turner on behalf of CTIA, the Wireless Association, intervener in this case in favor of the FCC. And I just want to start by emphasizing something that I think is implicit here, but needs to be kept in mind. The purpose of section 6409 was to allow modifications to existing wireless facilities to take place without going through onerous local zoning authority, that kind of discretionary review that takes an enormous amount of time and an enormous amount of resources. The FCC and Congress both recognize that wireless networks are dynamic. They change, and they change for a couple of different reasons. One, because new technology happens. Two, because new entrants come into the market and need to put their own facilities into these places. And three, because new spectrum is authorized for use for wireless service. And if you look at the separate statement of Chairman Pai, he sort of emphasizes this point. And he says, one of the things that we've been really concentrating on is making this new spectrum available. And if we don't also ensure that people can build out facilities to use that spectrum, then we won't have carried through our obligation to make sure that the United States is at the forefront of these kinds of wireless issues. Now, Judge Bennett, to your point, you asked about antennas. And I think it's important to keep in mind that antennas, as a matter of physics, are related to the spectrum that is being used for a particular type of wireless service. So a given antenna might be reusable if you get new spectrum, but oftentimes it won't be. And one of the things that you need to do, and this is in Commissioner Carr's statement, one of the things that you need to do when you get new spectrum is go out and swap antennas out and put up either additional antennas or different antennas in order to use that spectrum. To your point about a 100-foot antenna, I can represent, on behalf of the wireless industry, a 100-foot antenna is not useful for any of the spectrum that the wireless industry uses for wireless service. There's a physical relationship between the frequency of the spectrum and the size of the antenna. And in most circumstances, you're talking about, as we've seen in the record, between four and eight feet tall. So why, though, is the controlling factor the separation and not the increase in the overall height of the tower? So thank you, Your Honor, that's a really good question. And the point is, it goes to something that is embodied in Section 6409, right? Section 6409 says we want to encourage modifications, but we also want to encourage co-locations. And what that rule does is say, we're going to allow the placement of a new antenna on the tower, regardless of how much size impact there is, right? Even if you wouldn't be able to fit an antenna on the tower under the 10% rule, we're still going to allow you to put that antenna on the tower because we think it's important to have co-location be part of the 6409 rule. And that's a consistent, that definition of separation is one that goes back historically many, many years, right, it goes back to the co-location. I understand that, I just am having trouble understanding why, when the rule is concerned with height, why the separation is essentially the determining factor on which you determine if a new antenna is a substantial modification or not. So, it's a good question, and the answer to the question is, the rule is primarily concerned with height, but there is an exception. And the exception is, if the height restriction would be so severe that it would not allow the co-location of another antenna, we're going to allow the co-location of another antenna. Because that's what section 6409 envisions, right, that's the direction from Congress, make sure that these facilities can get built and make sure that they can be co-located on existing facilities. And the commission was simply carrying out that direction from Congress when it wrote the rule that way. And I think that actually goes to another question Your Honor asked earlier about the number of cabinets issue, right, and I think my friend got up and said, well, there has to be consistency between number of cabinets, whether that's a cumulative limit, and height, whether that's a cumulative limit. And I would submit to Your Honor that there doesn't have to be consistency between those two things. In fact, the commission is well within its rights to determine what substantial means. That is a obviously fairly ambiguous term, and when it adopted the regulations in 2014, it made a decision. And the decision that it made was that it was going to primarily look at height. Height was going to be a very significant concern, and we didn't want it to get higher than, you know, a certain amount above baseline. But we didn't have that same concern about cabinets, because cabinets are constrained, as Ms. May said, partly by the existing physical envelope that the other parts of the regulations impose, and partly by the practicalities that you can't add that many cabinets to an existing facility before you run out of space. And so it's perfectly logical for the commission to have chosen to impose a cumulative limit in one place and a non-cumulative limit in the other. I want to say, I know I'm running low on time, I want to say one more thing about the shot clock. As an industry, one of the things that we were running into is, and if you read the briefs from the other side, they'll say, well, you should just be forced to file an application. The locality should get to determine what that application is. The problem is many localities don't have applications. They don't have a clearly defined way to submit a 6409 application. They don't have particular procedures that you have to follow. And so you, as a carrier, are left to guess, what do I do? At what point does the shot clock start? And so what the commission did here in this order was say, we're going to have a flexible line, but we're going to have a clear line, right? So we're not going to say that everyone has to adopt the same application. We're not going to sort of bigfoot local government that way. What we are going to do is say, whatever your process is, the shot clock starts when that process is initiated. If you think that the carrier has submitted an incomplete application, you are free to toll the shot clock, right? And that's the solution to the problem that the other side raises. Well, it may well be that you're right, that this is a solution to a problem that came about after the reg was originally written, but it strikes me as a normal way of addressing a problem, which is changing the rule because the rule wasn't dealing with it, as opposed to, well, this is what it meant from the start. Well, Your Honor, I would disagree with you. I think that this is an interpretation of existing text and it doesn't require a legislative change, but I would also point you to the City of Arlington decision out of the Fifth Circuit, which I think serves as a model here. And the City of Arlington decision, the Fifth Circuit said, look, we think the establishment of a shot clock under Section 332, which is a separate statutory provision, we think that looks more like a legislative rule than a declaratory ruling. We think it was error for the commission to have done this through a declaratory ruling, but because the commission followed notice and comment procedure in its declaratory ruling, we're not gonna send it back. It would be a pointless formality to do so. And so I would submit to Your Honor that if you're concerned about this being a legislative rule change, that really is the same kind of harmless error. It's exactly the same kind of harmless error that the Fifth Circuit confronted in the City of Arlington case and said, you know, look, the FCC did everything here that it would have done in the legislative rule context. It gave everyone the same amount of notice. There was the same amount of participation. All of the people who care commented. So why should we send it back? All we would be doing is exercising in the, excuse me, needless formality. All right, thank you. Thank you, Your Honor. Hi, Your Honors. I'm gonna try to get through this in the time that I have. So I wanna keep in mind here that we have an FCC that's operating outside of the bounds of the statute, outside the bounds of what you could do with the declaratory ruling, and outside the bounds of the APA. When it comes to concealment, I wanna draw Your Honor's attention to the statute,  and the most logical reasons for concealment. And I wanna draw your attention to the statute as a way to read concealment when you're thinking about physical dimensions. Is something bigger than another? Can it be hidden? I wanted to flag in response to Judge Thomas's question that my colleague indicates from the 2014 order. It's paragraphs 188 to 100, and footnote 544, describing, I think, more concealment when it means camouflage as opposed to trying to pretend to be something else. The express evidence rule, I think, Judge Thomas, you were concerned about, and also Judge Bennett, if we decide concealment, are we worried about express evidence? But keep in mind, express evidence applies to not just the concealment rule, and it would apply to the concealment rule with regard to hiding facilities in addition to stealth facilities. So even if you agree with us about what concealment means, we still have to make sure that we're not allowing these things to happen. We're allowing the FCC to add new evidentiary standards on top of what concealment should mean. And in addition, part B76 is about permit conditions, and those are not just aesthetic conditions. Those could be, they could be a setback, it could be some sort of safety thing. So permit conditions are much more broad than my colleague from the FCC indicated, and certainly we need these permit conditions. The FCC said that there needed to be evidence, they were ongoing, and that is really not the norm for permit conditions, a permit speaks for itself. I wanted to get to height. Your honors, we felt like the briefing addressed height. I think your honor has gotten it correct, but I want to be clear that these rules expressly do apply to broadcast towers. San Francisco has a very famous, very big broadcast tower, and although the record was predominantly concerned with wireless antenna, who are Mr. Turner's clients, there is nothing about this rule that says you couldn't use it to put a very large antenna of the kind that you were concerned about. And this is one of the points I want to emphasize. These rules are going to be here for all time. Every time a new request comes in, this new thing is going to be added, and we have a congressional mandate to keep the changes insubstantial. It's not that these changes can't be made. We have a whole system with lots of procedural and substantive protections for the wireless industry to get these new changes in. It just can't go through this mandatory expressly. With regard to the cabinet rule and the parceling, I felt like my colleague from the agency may have erred a bit. If there are multiple requests, those multiple requests must be affirmed by the local government. I suppose if a carrier were gaming the system, that might be something we'd have to debate in court, but the courts, when these disputes cannot be resolved locally, and we resolve many of them just through negotiation, but when they can't be resolved, they go to a district court. The district court is going to look to these rules, and if the rules say you can do four every single time, then believe me, Mr. Turner is very good at telling the district courts what the FCC said, and that will be followed. With regard to the shot clock, I think the agency wanted to grant the localities considerable flexibility, and there is now an opportunity for gamesmanship on part of the local governments. I mean, I'm sorry, for gamesmanship on part of the wireless companies, who are now going to be able to try to say, okay, hey, we started the shot clock. We want to get a deemed granted remedy. They go to court and say this must be built. No questions asked once those 60 days run, so we need to have it be extremely clear, and in fact, the FCC has sort of muddied the water now in a way that I think violates the arbitrary and capricious standard. So I think to sum up, the FCC, there are some changes it could have made if it had actually undertaken administrative rulemaking. I wanted to distinguish Arlington, Your Honors, because in that case, right now, we're under a different situation. First of all, Arlington was a new interpretation. There was no existing rules, and then an agency declaratory ruling, so we didn't have any of the safeguards that are required with Kaiser. In Arlington, there was really two main questions. Could the FCC legally adopt shot clocks, and should the shot clock be 45 days or 60 days? Those issues were amply discussed in that record, but that is nothing like this record, where the industry asked for general, address these problems sort of solutions, and then we attempt to try to respond to them without really knowing what the FCC ever planned, and we never had an opportunity under the APA to propose our own new code sections to resolve the problems raised. So in sum, the FCC is trying to shoehorn in legislative rule changes using a declaratory ruling, but substantively, those decisions in the declaratory ruling are outside the bounds of the statute, permitting substantial changes. They're outside the bounds of what you can do with a declaratory ruling, violating Kaiser, the Supreme Court's guidance in Kaiser, and they're outside the bounds of the APA. They are arbitrary and capricious, and for all of these reasons, the FCC needs to put its analysis, that it has put here today, and that it put in it brief, it needs to put it in the order, and give something that the court may reveal. Thank you. Thank you. All right. Case just argued will be submitted, and with that, we are adjourned for today. We thank counsel for their arguments. All rise.
judges: BEA, BENNETT, THOMAS